200 So. 637

### BROWN v. STATE.

#### 6 Div. 570.

Court of Appeals of Alabama.

June 29, 1940.

Rehearing Denied Aug. 6, 1940.

**6**

DeGraffenried & McDuffie, of Tuscaloosa, for appellant.

Thos. S. Lawson, Atty. Gen., and James F. Matthews, Asst. Atty. Gen., for the State.

RICE, Judge.

Appellant was convicted of the offense of robbery, and his punishment fixed at imprisonment in the penitentiary for the term of ten years. Code 1923, § 5460.

He was represented on his trial below, and here, by able and astute counsel. And as a basis for what we will have to say in disposing of the appeal we will make, in large part, a statement of the facts shown in evidence *literally* from said counsels' brief. It follows:

"The appellant was indicted for the robbery of One Hundred Eighteen ($118.00) Dollars in currency, the property of one James Largin, the robbery supposedly having occurred on the night of. May 2, 1939, at the home of James Largin near Brookwood in Tuscaloosa County, Alabama—the only witnesses as to the facts being James Largin and his wife, Edna Largin.

"The said James Largin, commonly called Jim Largin, had admittedly let it be known around Brookwood that he was anxious to buy a fine diamond for his wife and, upon being told by one Bill Martin that he knew a man in Birmingham who had won some diamonds in a crap game and was selling them for $25.00 or $50.00 a piece and that he knew of a woman who had borrowed $183.00 on one of these rings which she had paid $25.00 for, that Jim said he wanted to buy one. It was further admitted that on May 2, 1939, the appellant came to Tuscaloosa County with one Chess Yarbrough and went to the store of James Largin near Brookwood and exhibited to him some stones alleged to be diamonds. That Jim Largin told him before buying the stone he wished to go to Tuscaloosa and have it appraised by a reliable jeweler. That during the afternoon the appellant and Jim Largin came to Tuscaloosa and had one of the stones appraised at the Fincher & Ozement Jewelry Company where it was appraised at $500.00. That later during the course of the same afternoon the appellant delivered to James Largin a stone supposed to have been the stone which had been appraised, but which was in fact not the same stone but a defective stone. There was a conflict in the testimony as to the amount Largin paid appellant for the stone; appellant testifying that Largin paid him $50.00 for the stone and Largin testifying that he paid appellant $25.00 for the stone.

"The State introduced testimony of Largin and his wife (Edna Largin)—very much in conflict—to the effect that during the same night of the above outlined transaction that appellant came to their home near Brookwood, and, after being permitted to enter therein, held a pistol on Jim Largin, picked up the trousers or overalls

of the said Jim Largin and took from one of the pockets of the said overalls a pocket-book containing $118.00 in currency alleged to be the property of the said Jim Largin.

"It was for this alleged robbery that the appellant was indicted"—and, we add, convicted.

A considerable number of exceptions were reserved on the taking of testimony; but each of them is obviously and patently to a ruling infected with no error. This is tacitly admitted by appellant's counsel in their brief filed here, inasmuch as the only error they urge upon us is the action of the lower court in overruling appellant's motion to set aside the verdict of the jury as for its being opposed to the great weight of the evidence.

Appellant, after making the admissions mentioned above, denied in his testimony that he was at the home of Jim Largin on the night in question, at all. But claimed that after he left Largin, and Brookwood, at about 4:30 o'clock or 5:00 o'clock on the afternoon of the above described "diamond transaction" he went on to Bessemer, thence to Adamsville, thence to Birmingham, thence to the home of one Popewell in Shelby County, Alabama, where he spent the night gambling. And he supported his testimony by that of a number of gamblers who testified he spent the night there at Popewell's with them.

Before making our own comments, it may be interesting to record some of those made by appellant's aggressive counsel. They say:

"The truth of the matter is that no robbery ever occurred. And the truth is in this case that two men, namely, Jim Largin and the appellant, were each trying to get something for nothing from the other and the appellant happened to be the cleverer of the two.

"It is simply a proposition where one man with loaded dice encountered another man with dice a trifle heavier loaded than his, and, if the conduct of both had not been so reprehensible, and the consequences so serious for the appellant, the affair would be somewhat amusing.

"The State's case is not founded on the mistaken recollection of witnesses, but is based entirely on the deliberate perjured testimony of Jim Largin and his wife Edna Largin, and the purpose of getting even with the appellant for tricking him about the diamond."

As stated, appellant's sole reliance for a reversal here of the judgment of conviction rendered against him is in persuading us to hold that the trial court erred in overruling his motion for a new trial, on the ground mentioned hereinabove. But we are not persuaded. And that, really, is enough to say.

Our cases of Melton v. State, 26 Ala.App. 265, 158 So. 196, and Willingham v. State, 28 Ala.App. 261, 183 So. 887, are urged upon us as authorities for our holding, here, in accord with appellant's insistence. But neither of them is similar.

Here, appellant admits that there was clear, direct, positive evidence pointing to —asseverating—his guilt. To repeat his counsels' own language: "The State's case is not founded on the mistaken recollection of witnesses, but is based entirely on the deliberate perjured testimony of Jim Largin and his wife Edna Largin, and the purpose of getting even with the appellant for tricking him about the diamond."

Now it may be that Jim Largin—along with appellant—was shown to be unworthy of belief.

It is noted we include *appellant* in this statement, even though his counsel begin their "Brief and Argument" filed here with the rather plaintive observation that: "The appellant, George Brown, is a white man 30 years of age, a resident of Birmingham, Jefferson County, Alabama, who proved his prior good character by people of prominent standing of his neighborhood."

And it is true his good *reputation* was established in the testimony. But his *character* was established by his own admission that he, in the presence of Jim Largin, had *one* diamond appraised; and then, when Jim was not looking, put another, inferior, spurious, diamond in its place, and delivered this last stone to Jim in the stead of the one that had been appraised.

But we digress.

Coming back to the State's testimony, we observe that whatever may be the status with reference to Jim Largin's testimony, we find nowhere a reflection upon the character or reputation of *Mrs. Edna Largin.* And we are very far removed from a feeling that we would be warranted in branding her, as appellant asks us to do, a *perjurer.* And this, even granting that her testimony, as given in this case, is not that upon which we, if we had been sitting as jurors, would have returned a verdict finding appellant guilty of robbery.

8

Before leaving the subject we had intended observing that the similarity of "standing" shown between Jim Largin and appellant—mentioned by appellant's counsel in their brief filed here—was such, apparently, as to completely confuse the able Assistant Attorney General representing the State on this appeal. We note that in his excellently prepared brief filed here he has substituted, throughout, the name of Brown, the appellant, where he had intended to insert—as is plain from the context—the name of Largin, the party alleged to have been robbed.

█ But to conclude, we observe, quoting from the brief here on behalf of the State: "The general charge should never be given when there is any (substantial) evidence, however weak and inconclusive it may be, tending to make a case against the party who asks it; *and in such case, though there be manifest discrepancies in the State's testimony the court should not on that account, merely, grant a motion for a new trial.*" Grimes v. State, 24 Ala.App. 378, 135 So. 652; Glover v. State, 25 Ala.App. 423, 148 So. 160; Weaver v. State, 22 Ala. App. 162, 114 So. 67; Davis v. State, 229 Ala. 674, 159 So. 209.

The judgment is affirmed.

Affirmed.

BRICKEN, Presiding Judge (dissenting).

After a careful reading of the record and the entire evidence in this case, and after an attentive and thoughtful consideration thereof, I have reached the conclusion that it would be unconscionable to permit the conviction of appellant to stand; that such conviction is so wrong and unjust, it borders upon a travesty of justice. I do not and cannot concur in the affirmance of the judgment of conviction from which this appeal was taken; nor can I endorse or approve numerous statements in the opinion the direct tendency of which is to unduly reflect upon, and cast opprobrium upon the several apparently disinterested witnesses who testified in behalf of the defendant, and which testimony, if believed, would have been a conclusive answer to the indictment. It does appear from the evidence that few of the witnesses (to be exact four of them), who testified to a perfect alibi for the defendant, were, on the night in question, invited to the private home of defendant's witness, Mr. J. O. Popewell, to engage in a game of cards, and some of them did play for stakes in said game. But it is unfair and unbecoming to blatantly term these witnesses as "gamblers;" for there being no dispute about the fact that said card game was played in a private home, and not in a public place, which the law prohibits, the parties so engaged violated no law of this State. Section 4235 of the Code 1923, the governing Statute, makes it an offense only, when the game with cards, etc. is played in a *public place.* A private residence is not per se, a public place, within the meaning of the Statute, supra. Coleman v. State, 20 Ala. 51. Moreover, there were a larger number of other witnesses, some ten or fifteen, who testified to facts tending to establish a perfect alibi for defendant, who were not at Mr. Popewell's home, on the night in question, and so far as this record shows no taint of "gambling" could be cast upon them; yet the opinion contains the unwarranted blanket statement, not borne out by the evidence, that on the question of alibi, "he (defendant) supported his testimony by that of a number of gamblers who testified he spent the night there at Popewell's with them."

The indictment in this case charged the defendant with the offense of robbery, the alleged injured party being designated as James Largin. Upon the trial the defendant was called upon only to answer and defend against the identical charge contained in the indictment, and none other. But it affirmatively appears from this record, that another and totally different charge wholly disconnected and having no relation to the charge of robbery, was injected into this case to the great detriment and injury to the defendant. This other charge had reference to another and totally different transaction between this appellant and the alleged injured party Largin, and a larger part of the testimony as shown by the record pertains to and has reference to this foreign matter, and portrays a shady transaction between these two parties; the transaction being what might properly be termed a "flim flam" game, where, as stated, in the opinion by Judge Rice of this Court resulted in establishing a bad character for this appellant, notwithstanding a large number of apparently disinterested witnesses testified in this case that he bore a good character. It appears to the writer that this appellant was actually put upon trial for *two* offenses instead of the one charge contained in the indictment. The record of the evidence discloses that more testimony was offered against the defendant

in support of the foreign charge upon which he was not being tried, than was offered against him on the trial of the charge for robbery. The opinion of this court, to which, as stated, ● do not concur, deals in the main, and it could be said, the judgment of affirmance was rested upon this foreign charge and not upon the charge for which he was being tried.

As to the charge upon which this case should have been tried and determined, that of robbery, but two witnesses were examined, towit: James Largin and his wife Edna Largin. Even the opinion of my associate admitted their testimony was "*very much in conflict.*" In this respect, if in no other, the record affords full support of the above quoted utterance in the opinion.

James Largin testified in substance, among numerous other things all hopelessly conflicting, that this appellant came to his home, on the night in question about 2:00 o'clock. "He knocked on the door and I asked who is it? I got up and opened the door and asked him in, he came in and asked me to go with him to see two fellows we were talking to that day about some diamonds, and if he made a trade with them he would give me a good cut of the money, and I says: 'Well I hate to go down there *this time of night* and talk to them.' As I stated it was about two o'clock at night. I do not know how long he had been knocking before I waked up. I and my wife were in the room." He further stated the defendant took his (Largin's) pocket book out of his pants' pocket at that time of night.

Mrs. Edna Largin, wife of the above named witness Jim Largin, and the only remaining witness as to the facts of the alleged robbery, testified on cross-examination: "It was sometime after nine o'clock that this man (defendant) came to the house that night. I hadn't been in bed very long, we were awake. * * * We retired that night the time my husband James came in, it might have been before nine o'clock. Jim came to bed before nine o'clock. He had been in bed about ten or fifteen minutes when they knocked on the door, and this man came in. I don't remember if Jim had

turned out the light." During her further examination she stated: "I went to bed about seven o'clock. Jim came in about nine o'clock and went to bed and he had been in bed ten or fifteen minutes. I did not go to sleep from the time James got to bed until the knock on the door came. I am positive of that." And later the concluding statement of the witness was as follows: "I looked at the clock when Jim came in. It was ten or fifteen minutes until nine. I did not look at the clock when Jim left after this man. I am positive that it was ten or fifteen minutes until nine when he went to bed. The clock was in the room. It was running. It was ten minutes until nine when George Brown came in."

The foregoing irreconcilable testimony of the only two witnesses as to the main facts is in line with and indicative of much of the other testimony given by these two witnesses. They were under the rule, hence could not hear each other testify. The writer does not mean to infer, or to state, that all this apparently wholly unreliable testimony entitled the defendant to a directed verdict. Certainly not. It was for the jury to consider and determine initially, and from long years of experience the writer is firmly of the opinion that no unbiased jury would ever have convicted a defendant upon so serious a charge as here, unless it had been for the unwarranted admission of the voluminous testimony as to the other offense above referred to. It does affirmatively appear that the prosecutor entertained a grievance against the accused, hence a motive in finally prosecuting him upon an apparently trumped up charge. The writer is of the opinion, however, that the unsavory testimony adduced upon the trial and from the whole atmosphere thereof, that the trial court should promptly have granted defendant's motion for a new trial, and erred in failing so to do. For the above stated reasons, and many others apparent on the trial, but cannot be here detailed the writer without hesitation dissents from the opinion affirming the judgment of conviction from which this appeal was taken. The cause should have been reversed and remanded.